UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUCHETTS

| | | |
|---|---|---|
| GEMINI FISHING, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.  1:24-cv-12536-WGY |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOMELAND SECURITY; ALEJANDRO | ) | |
| MAYORKAS, in his capacity as Secretary | ) | |
| of United States Department of Homeland | ) | |
| Security; UNITED STATES COAST | ) | |
| GUARD, and  AMY M. BEACH, in her | ) | |
| capacity as Director of Inspections and | ) | |
| Compliance, National Vessel | ) | |
| Documentation Center for the United States | ) | |
| Coast Guard, | ) | |
| Defendants. | ) | |

## PLAINTIFF'S PRELIMINARY TRIAL MEMORANDUM

Plaintiff, Gemini Fishing, Inc. ("Gemini"), submits this preliminary trial memorandum based upon the Administrative Record filed.  ECF Doc. 29 through 29-4 (cited hereafter as "AR").  In filing this memorandum, Gemini preserves the right to seek leave to submit a supplemental trial memorandum after presentation of testimony and additional evidence during the evidentiary hearing scheduled for December 18, 2024.

Based solely on the Administrative Record, Gemini is entitled to judgment on the merits.

The issue in this case is straightforward:  whether, after having previously provided guidance to Gemini's professional naval architect and confirmed internally that there is no minimum amount of material that must be taken from an existing vessel and  incorporated into a rebuild project to avoid creating a "new vessel," the USCG acted arbitrarily and capriciously in changing its position and determining that the F/V Velaris, which undisputedly incorporates material from the F/V Michigan, should be considered a "new vessel."

1

Gemini's position on the law is further set forth in the memorandum filed in support of its motion for preliminary injunctive relief (ECF No. 8), which is incorporated herein by reference. Gemini's arguments are further supported by the Administrative Record.

I. **On multiple occasions, the USCG told Gemini's representatives that a vessel will be considered "rebuilt" rather than "new" if it incorporates material from an older vessel.**

Garrett Norton is a naval architect with decades of experience designing fishing vessels to United States Coast Guard ("USCG" or "the Government") and industry standards.  In 2017, while working for a different fishing vessel client, Mr. Norton contacted the Chief of the USCG National Vessel Documentation Center to obtain guidance on whether a rebuild project that involved reuse of only a limited amount of material taken from an old vessel would result in a "new vessel."  AR 494. Specifically, Mr. Norton asked for "any guidance" on how to "make sure the vessel will maintain its original Official Number and its existing build status, such as a percentage of the original vessel remaining."  Id.  In his inquiry, Mr. Norton explained that he was aware that in many instances historic wooden vessels where "very little if any of the original vessels remain, yet the vessels are considered to be existing vessels."  Id.  Mr. Norton also explained his experience working on a similar project previously where he was told by the USCG that "only a portion of the keel and section of a bulkhead was required to maintain the original status on a US built vessel."  Id.

In response to Mr. Norton's inquiry, the USCG did not dispute any of the historical facts and told him that there is no minimum amount of material that would be required to be reused and that his anticipated project "would not require a new vessel determination."  AR 595.

Based on this guidance and consistent with other rebuild projects, Mr. Norton prepared plans that contemplated harvesting steel from the F/V Michigan and incorporating that steel in the project to rebuild the vessel as the F/V Velaris.

After the project was completed, beginning in February 2024, the USCG commenced an investigation into whether the F/V Velaris was a "new vessel" rather than the F/V Michigan rebuilt. AR 490. Upon learning of the investigation, Mr. Norton again reached out to the Chief of the Commercial Division of the USCG National Vessel Documentation Center to confirm that the prior guidance he received applied equally to the F/V Velaris and he was told that it does. AR 26.

These communications and assurances are fully supported in the Administrative Record and the USCG does not dispute them. In short, it is definitely and conclusively established that the USCG has, on multiple occasions, told Gemini's expert architect that it would not sua sponte change its position and enforce USCG regulations in the manner it now seeks to undertake.

**II.    In its investigation of this specific matter, USCG representatives agreed that there is no minimum amount of material required to be reused in a "rebuilt vessel" to avoid being classified as "new vessel."**

Not only are the USCG's communications and guidance with Mr. Norton undisputed, they are fully consistent with the USCG's own internal evaluation of applicable regulations as reflected in the Administrative Record.

As part of its investigation, the USCG enlisted Chief Jennifer Doherty of the USCG's Office of Design & Engineering Standards to analyze the F/V Velaris and 46 CFR 67.3. See Memorandum dated July 12, 2024, AR 461-66. Reviewing the applicable regulatory text, Chief Dougherty agreed that there is "no prescribed amount" of materials that must be used in a rebuilt vessel. Id. Chief Dougherty's observation is consistent with the advice that the USCG provided to Mr. Norton on multiple occasions.

The Administrative Record definitely and conclusively establishes that, before rendering its decision in this matter, the USCG itself recognized that there is no minimum amount of material required to be reused in a "rebuilt vessel" to avoid being classified as "new vessel."

III.    **The USCG raises new arguments and attempts to rewrite the regulatory definition of a "new vessel" to support its position.**

46 CFR 67.3 provides alternative definitions of a "new vessel."  First, a vessel is "new" if "the hull and superstructure of which are constructed entirely of new materials."  Section 67.3(1).  Alternatively, 46 CFR 67.3(2) defines a "new vessel" as one "which is constructed using structural parts of an existing vessel, which parts have been torn down so that they are no longer advanced to a degree which would commit them to use in the building of a vessel."

A.    **Section 67.3(1)**

With respect to § 67.3(1), the USCG's analysis and arguments changed without the USCG providing any verbal or written notice to owners, naval architects, and vessel builders who had already committed to invest millions of dollars into rebuilding older fishing vessels..

Early in its investigation, the USCG internally recognized "that there is no prescribed amount of [original] existing parts that must be used in [a] rebuilt vessel."  AR 462.  In order to implicate § 67.3(1), however, the USCG attempted to shift the focus of this section from the amount of reused material (which they acknowledged had no minimum), to the quality or nature of the reused material.  According to its internal memorandum, in order to avoid becoming a "new vessel," the reused materials must be "structural parts that are structurally used in the rebuild vessel's hull or superstructure." AR 462 (emphasis in original).

In rendering its decisions and communicating with Gemini, however, the USCG apparently abandoned the "structural" analysis it considered internally.  Neither its July 8, 2024, letter canceling the F/V Velaris' Certificate of Documentation (AR 2), nor its September 3, 2024, appeal denial (AR 1) contains any reference to the quality or structural nature of the reused materials.  Instead, at all times, the USCG's communications with Gemini focused exclusively on the quantity of reused materials.  In the USCG's initial determination letter dated July 8, 2024, (AR 2-3), Director

4

Washburn completely disregarded Chief Dougherty's observation (and Chief Heck's explicit advice to Mr. Norton) that there was no minimum amount of material needed to be reused to avoid becoming a "new vessel." Instead, Director Washburn reverted to a "quantity" rather than "quality" analysis and reported her belief that the insertion of "a 1' x 20' section of the keel cropped from the vessel MICHIGAN and inserted into the enclosed skeg of the VELARIS" was not enough old material to avoid being found to be "constructed entirely of new material." AR 2.

Now, in this litigation, the Government reverts back to its previously unstated internal analysis that it is the quality or nature of the reused materials that controls, rather than the quantity of materials used. In litigation, the Government claims that the F/V Velaris meets the definition of § 67.3(1) because, according to it, although the reused pieces of the F/V Michigan are incorporated into the skeg of the vessel, those pieces do not provide structural integrity to the hull or superstructure of the F/V Velaris. ECF Doc. 33 at p.19.

The Government, however, may not change its theories now. "It is a 'foundational principle of administrative law' that judicial review of agency actions is limited to 'the grounds that the agency invoked when it took the action.' An agency may later 'elaborate' on those grounds, but it 'may not provide new ones.' In other words, an agency must stand by the reasons it provided at the time of its decision and cannot rely on post-hoc rationalizations developed and presented during litigation." In re Fin. Oversight & Mgmt. Bd. for Puerto Rico, 37 F.4th 746, 761 (1st Cir. 2022) (quoting DHS v. Regents of the Univ. of Cal., 591 U.S. 1(2020)). "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself," not by its litigation counsel. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50, 103 S. Ct. 2856, 2870, 77 L. Ed. 2d 443 (1983).

Beginning with the "quantity" argument the USCG raised before litigation (the only argument regarding § 67.3(1) it raised before litigation), § 67.3(1) allows for consideration only of the amount

of reused material and asks only whether the vessel is constructed "entirely" of new material. The word "entirely" is clear and unambiguous. See e.g., N. Vill. Liquors, Inc. v. Vascof Realty Corp., 66 A.D.2d 685, 411 N.Y.S.2d 25, 26 (1978) (Burns, J.P. dissenting) ("The parties agree that the word 'entire' … is defined in leading dictionaries as 'whole,' 'complete,' 'consisting of one piece,' 'undivided' (Webster's Third Dictionary, Unabridged; Random House Dictionary of the English Language, Unabridged; Webster's New Word Dictionary of the American Language; Black's Law Dictionary). The meaning of the word is, thus, unambiguous."). A vessel is either comprised "entirely" of new materials, or it is not. "Entirely" does not contemplate an evaluation of the nature of materials or the manner in which they are reused. If the hull and superstructure of a vessel is not made "entirely" of new materials, the vessel is not "new." The USCG has acknowledged this both internally (AR 462) and in its repeated communications with Mr. Norton (AR 26 & 590).

The USCG also necessarily acknowledged that the vessel was not a "new vessel" under § 67.3(1) when it recommended internally that Gemini submit an application for a new vessel determination in accordance with § 67.175(b). AR 8. Pursuant to § 67.175(a), an application for a new vessel determination is unnecessary and inappropriate "when a vessel has been constructed entirely of new materials…." A new vessel determination may be sought only "when parts of an existing vessel have been used in the construction of a vessel and the owner wants a determination that the resulting vessel is new…." Section 67.175(b). Having recommended that Gemini seek a new vessel determination under § 67.175(b), the USCG necessarily recognized that the F/V Velaris has not been "constructed entirely of new materials" as contemplated by § 67.3(1). Otherwise, such a determination request would be inappropriate under § 67.175(a). The USCG recommended this procedure only because it is undisputed that "parts of [the F/V Michigan] have been used in the construction of" the F/V Velaris. § 67.175(b).

6

Even if the USCG were now permitted to shift to a "quality"-based argument regarding the test under § 67.3(a), that argument finds no support under the language of the regulation. As discussed above, § 67.3(1) contains no reference to structural matters or the quality or nature of materials reused. Moreover, having never raised structural issues in its communications with Gemini, the USCG cannot now support the Documentation cancelation based on factors that were never disclosed to Gemini.

For these reasons, to the extent the USCG seeks to support its Documentation cancellation based on § 67.3(1), the USCG's actions are arbitrary and capricious.

**B.    Section 67.3(2)**

In analyzing the alternative definition of "new vessel" set forth in § 67.3(2), the USCG acknowledges that that subsection uses unfamiliar terms. Referencing subsection (2), Chief Dougherty noted, "the terms 'torn down' and 'no longer advanced to a degree which would commit them to use…' have no defined meanings and are not common industry terms in shipbuilding." AR 462.

Struggling to make sense of the USCG's own regulatory language, Chief Dougherty for the first time "interpret[ed] the technical basis of the definition to be whether the [original] existing parts were structural but were subsequently cropped, cut down, or otherwise modified to the extent that they cannot be used as structural parts in the [rebuilt] vessel's hull or superstructure." Id.

In communicating its position with Gemini, the USCG never referenced any of the ambiguity that Chief Dougherty acknowledged. Nor did it disclose that it would be interpreting § 67.3(2) on a "technical basis" to refine the language in the regulation. Despite Chief Dougherty's consideration of whether the reused parts were "structural" before being "subsequently cropped, cut down, or otherwise modified" so that they could not be used as structural parts in the rebuilt vessel, the USCG

never communicated those purported factors to Gemini (or previously to any naval architects, shipbuilders, or commercial fishing vessel owners).

Instead, in its July 8, 2024, cancellation letter, the USCG said that the F/V Velaris constituted a "new vessel" under § 67.3(2) because "the use of a single 1' x. 20' section of keel from a previous vessel is not sufficient to relieve the vessel of its status as a new vessel." AR 3. The USCG also cited a lack of "information concerning the current state or disposition of the vessel formally known as the MICHIGAN" or additional information "showing the use of any other materials from the MICHIGAN." Id. The appeal denial letter offers no further explanation. AR 1.

Once again, the USCG now attempts to revert back to Chief Dougherty's interpretation discussed above. In its trial brief, the USCG reinserts the "structural" component of the analysis that was advanced by Chief Dougherty, but which was omitted from the USCG's communications with Gemini. Once again, however, the USCG is constrained by the reasons it disclosed to Gemini before litigation. In re Fin. Oversight & Mgmt. Bd. for Puerto Rico, 37 F.4th at 761.

None of the reasons advanced by the USCG regarding § 67.3(2) before litigation withstand scrutiny. The USCG's first contention was that the use of a 20-foot keel section "is not sufficient to relieve the vessel of its status as a new vessel." AR 3. Second, the USCG suggested that the F/V Velaris is a new vessel because there was insufficient information about what other materials from the F/V Michigan were reused. Id. Once again, this explanation is an attempt to establish a minimum "quantity" test that the USCG has repeatedly stated does not exist and finds no support in § 67.3(2). Likewise, the USCG's claimed uncertainty about the fate of any remaining pieces of the F/V Michigan has no bearing on whether the F/V Velaris constitutes a "new vessel" under § 67.3(2) and was information that was never previously requested of Gemini. See AR 9, 16

Now, in litigation, the USCG attempts to revive Chief Dougherty's "structural"-based analysis of § 67.3(2). According to the UCSG's trial memorandum, it now believes the pieces of the

F/V Michigan that were "torn down" from the F/V Michigan and installed in the F/V Velaris vessel were too insignificant to the F/V Velaris to avoid a "new vessel" determination. ECF Doc. 33 at p.20. But, once again, this analysis is inconsistent with their previous written guidance and the text of the regulation. As poorly drafted as it is, it is clear that § 67.3(2) considers only whether the reused parts of the old vessel were "structural," not whether they were used to constitute or support the structure of the rebuilt vessel. The USCG's new focus on the way in which reused structural parts are employed is unsupported by § 67.3(2).

To the extent the USCG complains that Gemini failed to produce information necessary to avoid a "new vessel" status under § 67.3(2), the USCG bears responsibility for this. First, despite its acknowledgement that the regulation is poorly drafted and uses terms that are not defined and "are not common industry terms in shipbuilding," AR 462, the USCG requested information using the same regulatory text that it lamented. C.f., AR 462 (noting that the phrases "torn down" and "no longer advanced to a degree which would commit them to use" are not defined terms and "are not common industry terms in shipbuilding") and AR 11 (requesting information about the "extent to which those materials were torn down").

Second, because the USCG always focused on the amount of material reused rather than the way it was reused, there was nothing further for Gemini to provide that was relevant to the USCG's disclosed approach to the issue. Gemini provided information demonstrating that the F/V Velaris was constructed using a limited amount of steel harvested from the F/V Michigan. The USCG may have requested additional blueprints, drawings, sketches, etc…, and Gemini stated that Mr. Norton viewed such plans as his intellectual property but would provide them during a meeting. AR 461. But, ultimately, such information was irrelevant to the analysis that the USCG actually employed in its communications with Gemini, which focused only on the amount of reused materials.

#17693789v1

**IV.    An industry practice has emerged from, and in reliance on, the USCG's practice of recognizing fishing vessels build with materials taken from obsolete vessels as "rebuilt" rather than "new."**

The record establishes that the shipbuilding practices in the commercial fishing industry have developed based upon, and in accordance with, the USCG's prior interpretation of the "new vessel" definition in § 67.3 and its historical inaction.

This industry practice is reflected in Mr. Norton's communications with the USCG when he sought guidance from the USCG and discussed his prior experiences.  AR 494.

Internal communications contained in the Administrative Record demonstrate conclusively that the USCG has been fully aware of at least three similar rebuild projects.  AR 491.  Yet, despite acknowledging those instances, the record demonstrated definitively that the USCG has never taken any actions against any vessels other than the F/V Velaris.  Id.  More troubling, prior to this case, the USCG has never provided written guidance to the industry suggesting that it disagreed with the industry practices described by Mr. Norton or Gemini.  There is nothing in the record to refute that these have been industry practices and standards.

The Administrative Record establishes definitively that the fishing vessel construction industry has consistently followed the F/V Velaris rebuild plan and that the USCG knowingly encouraged these practices and/or sat idly by and watched it develop.  Rather than treat all vessel owners equally, as the USCG is expected to do, Thompson v. Barr, 959 F.3d 476, 484–85 (1st Cir. 2020), the USCG has now inexplicably made Gemini (and Mr. Kulpinski) the target of its new enforcement strategy.  In doing so, the USCG makes no effort to acknowledge its change in policy or departure from its own precedent.  This unexplained change is compelling evidence that the determination in this matter is arbitrary and capricious.  Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n, 59 F.3d 284, 291 (1st Cir. 1995).

"[W]here, as here, an [the USCG's] announcement of its interpretation is preceded by a very

10

lengthy period of conspicuous inaction, the potential for unfair surprise is acute" and deference is inappropriate. <u>Christopher v. SmithKline Beecham Corp.</u>, 567 U.S. 142, 158 (2012). Here, the limited information that the USCG elected to include in the Administrative Record demonstrates that at least six vessel owners (including Gemini) have proceeded based on the USCG's history of non-enforcement in the manner it seeks now. <u>See</u> AR 491 (USCG identifying three other projects "in the build stage"); AR (Mr. Norton identifying two other similar projects). Having lulled Gemini and the fishing industry in general into a sense of security based on its past interpretations and actions, the USCG encouraged Mr. Kulpinski to borrow money and place his home and business on the line by spending Five Million ($5,000,000) Dollars to rebuild the F/V Velaris. In this situation, the USCG is not entitled to deference since it has clearly adopted a novel and contrary position that would result in significant financial liability and loss to Gemini and to the industry as a whole. <u>Sun Cap. Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund</u>, 724 F.3d 129, 140 (1st Cir. 2013) ("deference is inappropriate where significant monetary liability would be imposed on a party for conduct that took place at a time when that party lacked fair notice of the interpretation at issue").

## CONCLUSION

For the reasons set forth herein, and as may be further advanced following the evidentiary hearing, Gemini respectfully requests that the Court enter judgment in favor of Gemini as requested in the Complaint.

By its Attorneys,

/s/ John A. Markey, Jr.
John A. Markey, Jr.
Markey and Walsh
50 Homers Wharf
New Bedford, MA 02740
(508) 993-9711
(508) 993-0469

/s/ Michael J. Daly
/s/ Stanley F. Pupecki
Michael J. Daly, Esq., (BBO 655838)
Stanley F. Pupecki, Esq., (BBO 655842)
PIERCE ATWOOD LLP
One Citizens Plaza, 10th Floor
Providence, RI  02903
(401) 490-3400
(401) 588-5166 (fax)
spupecki@pierceatwood.com

Date:  December 16, 2024            *Attorneys for Plaintiff Gemini Fishing, Inc.*

## CERTIFICATE OF SERVICE

I certify that, on December 16, 2024, the foregoing document was electronically filed with the Clerk of the Court and served on all counsel of record by electronic means.

/s/ Michael J. Daly

#17693789v1