UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                           )
GEMINI FISHING INC.,       )
                           )
            Plaintiff,     )
                           )
       v.                  )         CIVIL ACTION
                           )         NO. 24-12536-WGY
UNITED STATES DEPARTMENT OF)
HOMELAND SECURITY, KRISTI NOEM in )
her capacity as Secretary of the )
United States Department of )
Homeland Security, AMY BEACH, in )
her capacity as Director of )
Inspections and Compliance, )
National Vessel Documentation )
Center for the United States Coast )
Guard, and UNITED STATES COAST )
GUARD,                     )
                           )
            Defendants.    )
_____)
```

YOUNG, D.J.                              May 8, 2025


**FINDINGS OF FACT AND RULINGS OF LAW**

*Statutes and regulations, when possible, must be construed in accordance with their "plain and ordinary meaning."* U.S. *v.* Abreu, *106 F.4th 1, 12 (1st Cir. 2024) (citing* Bostock *v.* Clayton Cnty., *590 U.S. 644, 654 (2020)) (referring to statutes);* see also *Textron* Inc. *v.* Commissioner of Internal Revenue, *336 F.3d 26, 31 (1st Cir. 2003) ("The Supreme Court has repeatedly emphasized the importance of the plain meaning rule, stating that if the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written.").*

*"A fifth grader would say [the* VELARIS] *is a 'new boat.'"  Statement of plaintiff's counsel.*

*Nothing more, really, need be said, but because this is a legal opinion issued pursuant to Fed. R. Civ. P. 52, a great deal must be.*

[1]

## I.    INTRODUCTION

Gemini Fishing, Inc. ("Gemini") sued the United States Department of Homeland Security ("DHS"), DHS Secretary Kristi Noem, the United States Coast Guard, and Amy M. Beach, the Director of Inspections and Compliance for the Coast Guard's National Vessel and Documentation Center ("NVDC") (collectively, "the Coast Guard"), alleging a violation of the Administrative Procedure Act ("APA"),  based on the Coast Guard's allegedly arbitrary and capricious action in determining that Gemini's fishing vessel Velaris was a new vessel and revoking its Certificate of Documentation.  See Compl. ¶¶ 55-63, ECF No. 1. Gemini then filed a motion for a preliminary injunction to suspend the cancellation of the Velaris's certificate on October 25, 2024.  Mot. Prelim. Inj., ECF No. 7.  This Court held a hearing on this motion on November 14, 2024, then collapsed this motion with trial on the merits in accordance with Rule 65(a)(2) of the Federal Rules of Civil Procedure, and set dates for an evidentiary hearing and for bench trial.  See Elec. Clerk's Notes, ECF No. 19; Fed. R. Civ. P. 65(a)(2).

This Court held a two-day bench trial on December 18 and 19, 2024.  Elec. Clerk's Notes, ECF No. 36; Elec. Clerk's Notes, ECF No. 38.  At the conclusion of the trial, this Court took the matter under advisement.

This Court now rules that the Coast Guard's action in canceling the Velaris's Certificate of Documentation was not arbitrary or capricious under the APA.

## II.  FINDINGS OF FACT[1]

### A.    The Velaris's Construction

In July 2020, Gemini's president and sole owner Gregory Kulpinski ("Kulpinski") purchased the F/V Michigan ("the Michigan"), a 114-foot scallop fishing boat built in 1947 and documented with the Coast Guard under Official Number 252094, together with its fishing license, for $6,150,000, aided by a bank loan.  Decl. Kulpinski ¶¶ 1, 7-8, ECF No. 9; Admin. R. ("AR") 208-09, 247, ECF No. 29.  Kulpinski used the Michigan for scallop fishing until he deemed that it was no longer safe for commercial fishing in 2021, at which time he hired Garrett Norton ("Norton") of Farrell and Norton Naval Architects[2] to develop a plan for the rebuild of the Michigan.  Decl. Kulpinski ¶¶ 8-10.  Norton recommended extracting a roughly twenty-foot

---

[1] Most of the facts relevant to this decision are uncontested.  This Court held an evidentiary hearing on December 18, 2024, to clarify whether Gemini acted in conformity with a broader fishing industry practice when it undertook the actions at issue here, which Gemini failed to show.  These facts also include some undisputed assertions made via declaration and supported by testimony at trial, but only insofar as they elaborate on facts clearly established in the Administrative Record.

[2] Norton, it turns out, is not a licensed naval architect himself but works under the direction of one.

section of the Michigan and rebuilding the rest of the ship around this section, which he advised would permit the Michigan to retain its original documentation and Official Number, along with its permits.  Id. ¶ 11.[3]  Norton informed Kulpinski that this plan was based on prior guidance he had received from the Coast Guard in connection with an almost identical project in 2017.  Id. ¶ 12; AR 25, 494-95.

Based on this advice, Kulpinski decided to proceed with Norton's plan, and hired a certified marine surveyor to oversee the project so that it would meet the relevant safety standards. Decl. Kulpinski ¶ 15.  Kulpinski planned to renew the Michigan's Certificate of Documentation under the same Official Number, change the name of the vessel to the "Velaris," and continue fishing in accordance with its permits.  Id. ¶ 13.  He believed that to do otherwise -- that is, to construct the Velaris as an

---

[3] The Coast Guard's Naval Architecture Division's build review memorandum, based on materials submitted to the NVDC by Gemini, describes the section removed from the Michigan as a "cropped keel section," measuring "12 inches high by 20 feet in length," which was "incorporated into the VELARIS by cutting it into shorter lengths and welding them on top of the VELARIS' vertical keel plate, between the vertical skeg frames."  AR 461. Both Kulpinski and Norton stated in their declarations that the removed section was taken from the Michigan's keel, Decl. Kulpinski ¶ 17; Decl. Norton ¶¶ 9, 12, ECF No. 10, but at trial Marine Surveyor Michael Collyer ("Collyer") testified that he observed the section as it was removed from the Michigan and as it was placed in the Velaris and that he believed it was taken from the Michigan's bulwark, which is supported by the photographic evidence in the record, AR 455-60.

entirely "new vessel" -- would be to subject it to expensive construction and classification standards that would add hundreds of thousands of dollars to the project's cost.  Id. ¶ 14.

In March 2021, Gemini hired Duckworth Steel Boats Inc. ("Duckworth") of Tarpon Springs, Florida[4] to complete the rebuild, and then shipped a twenty-foot-long section of the Michigan's bulwark to Duckworth to commence the rebuild process. Id. ¶¶ 16-17; AR 173, 181.  Gemini's engineer contacted Caterpillar Inc. to build a new custom Tier 3 engine for the Velaris, which it agreed to do after reviewing possible legal issues involved in the rebuild.[5]  Decl. Kulpinski ¶ 18.  The Michigan's engine was destroyed, and the rest of the vessel was scrapped.  Id. ¶¶ 18-19.

After a lengthy, Covid-related delay, Duckworth was ultimately unable to complete the rebuild, and in November 2023 the nearly complete vessel was shipped to Fairhaven Shipyard for finishing.  Id. ¶¶ 20-22.  The Velaris commenced fishing on March 7, 2024.  Id. ¶ 29.

---

[4] Tarpon Springs, Florida, located near the mouth of the Anclote River where it flows into the Gulf of Mexico, is one of America's historic shipbuilding sites.

[5] As was clarified at trial, had the Velaris been deemed a new vessel, it would have required a more expensive Tier 4 engine to comply with current EPA standards.  This was apparently the reason for Caterpillar Inc.'s hesitation.

**B.    The Certification of the Velaris**

On July 17, 2020, Gemini applied to the Coast Guard's NVDC to update the Michigan's Certificate of Documentation.  AR 204-17.  The NVDC issued an updated Certificate of Documentation for the Michigan on August 10, 2020, with an expiration date of August 31, 2021.  Id. at 247.  On July 30, 2021, Gemini again applied for a renewed certificate, and certified that the vessel specifications set out in the prior certificate "remain absolutely the same."  Id. at 304.  The NVDC issued another Certificate of Documentation, with an expiration date of August 31, 2022.  Id. at 305.

Meanwhile, on May 13, 2021, Gemini submitted an incomplete application for initial documentation for the Velaris as a new vessel, stating that it was built in 2021 in Tarpon Springs, Florida, and noting that the required Builder's Certification form (CG-1261) was to follow.  Id. at 158.  On October 31, 2021, because it remained incomplete, the NVDC canceled this application.  Id. at 203.

As the Coast Guard notes, the precise date of the Michigan's scrapping is not clear from the record.  Id. at 3, 16; Defs.' Br. 4-5, ECF No. 33.  Kulpinski states that the twenty-foot section of the Michigan that was incorporated into the Velaris was shipped to Duckworth in 2021, presumably after the contract for the Velaris's construction was signed in March,

and attaches an October 21, 2021 letter stating that "the remains of the F/V MICHIGAN are being transferred to Atlantic Coast Dismantling for the sole purpose of being scrapped." Decl. Kulpinski, Ex. C, Kulpinski Letter to Atl. Coast Dismantling, ECF No. 9-3. The Coast Guard also cites a photograph in the record of the relevant section of the Michigan's being cut out of the vessel that is dated to October 20, 2021, and another photograph showing pieces of that section incorporated into the Velaris's skeg that is dated to June 9, 2022. Defs.' Br. 4; AR 454-55.

On July 11, 2022, Gemini again applied for renewal of the Michigan's Certificate of Documentation, and certified that the Michigan's name, tonnage, dimensions, and propulsion remained "absolutely the same." AR 307. Based on this certification, the NVDC issued a Certificate of Documentation for the Michigan on July 20, 2022, with an expiration date of August 31, 2023. Id. at 308.

On June 16, 2023, Gemini applied to exchange the Michigan's certificate for a new Certificate of Documentation in the name of the Velaris, certifying that the vessel had not been rebuilt or substantially altered. Id. at 354-56. Based on this information, the NVDC exchanged the certificate on June 27, 2023, issuing a certificate with a new expiration date of June 30, 2024. Id. at 367. Gemini then submitted a request for

[7]

replacement of a lost or wrongfully withheld certificate on February 14, 2024, again certifying that the vessel had not been rebuilt or substantially altered. Id. at 406-08.[6] The requested certificate was issued on May 11, 2024. Decl. Kulpinski ¶ 35; id., Ex. L, Certificate, ECF No. 9-12.

The Velaris embarked on its first fishing expedition on March 7, 2024. Decl. Kulpinski ¶ 29. During this trip, Kulpinski received a Port Order from the Coast Guard stating that the Velaris had commenced commercial fishing after its Commercial Vessel Decal had been revoked. Id. This revocation was based on a routine safety examination of the Velaris that had been conducted by a third-party examiner on February 23, 2024, which led the Coast Guard to question inconsistencies in the vessel's paperwork. AR 490-506; Defs.' Br. 6-7. Due to this questioning, Norton had reached out to the Coast Guard on March, 1, 2024 to confirm that the 2017 informal guidance given with respect to a different project would apply to the Velaris such that it would not be deemed a new vessel, AR 25-26, 494-95, 663-65, and followed up with a phone conversation on March 6, Decl. Norton ¶ 6, AR 484.

_____

[6] At trial, Gemini attributed this misrepresentation to clerical error, and Kulpinski testified that Gemini had hired an outside firm to handle the vessel's paperwork. Gemini's counsel stated the same in a May 2024 letter to the NVDC's Director. AR 21.

Upon receiving the order, Kulpinski returned to port and, after discussions with the Coast Guard, obtained a safety sticker and an interim six-month fishing permit for the Velaris. Decl. Kulpinski ¶¶ 30-31.

After some internal discussion as to whether a major conversion or new vessel determination was appropriate, including consultation with the Coast Guard's Marine Safety Center which recommended that a new vessel determination be made, AR 9-10, 490-93, 656-59, the NVDC's Director Christina G. Washburn ("Director Washburn") sent a letter to Gemini on April 1, 2024 notifying Gemini of the Coast Guard's inquiry into whether the Velaris was a new vessel, noting the potential discrepancies in Gemini's representations to the NVDC, and requesting comprehensive records to determine the vessel's build status, id. at 11-12.  The letter set a thirty-day deadline for response.  Id. at 12.

On May 10, 2024, Gemini responded with a letter from counsel and a submission of some of the requested materials. Id. at 21-56.  On May 23, 2024, the NVDC requested assistance determining the Velaris's build status from the Coast Guard's Office of Design and Engineering Standards' Naval Architecture Division.  Id. at 467.  On June 7, 2024, the NVDC issued a second demand letter to Gemini for more information, again with a thirty-day deadline for response.  Id. at 16-17.

[9]

Gemini did not respond to this second request, and the NVDC cancelled the Velaris's certificate by letter from Director Washburn on July 8, 2024, stating that it had determined the Velaris was a new vessel.  Id. at 2-3.  The Coast Guard's Naval Architecture Division responded to the NVDC's request for assistance on July 12, 2024, in a memorandum stating that the material from the Michigan that was incorporated into the Velaris was extraneous to the Velaris's keel structure and did not contribute to the structural integrity of the vessel, and thus the Velaris was a new vessel.  Id. at 461-66.

C.  **The Coast Guard's Review Process**

Gemini appealed the NVDC's decision on August 7, 2024, via a letter to the Coast Guard's Director of Inspections and Compliance Captain A.M. Beach and a re-submission of the materials already provided to the NVDC.  Id. at 57-156.  Captain Beach upheld the NVDC's decision to cancel the Velaris's certificate in a letter issued on September 3, 2024, stating that the NVDC had correctly determined that the Velaris was a new vessel, citing the Office of Design and Engineering Standards' and Marine Safety Center's review, and noting that Gemini had twice falsely certified that the Velaris had not been rebuilt or substantially altered.  Id. at 1.  As the Coast Guard notes, both this letter and the initial NVDC determination letter invited Gemini to apply for a certificate of

documentation for the new vessel Velaris, but Gemini has not done so.  Id. at 1, 3; Defs.' Br. 12.

## III. RULINGS OF LAW

Gemini asserts two counts against the Coast Guard: (1) a violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), based on the Coast Guard's allegedly arbitrary cancellation of the Velaris's Certificate of Documentation, Compl. ¶¶ 40-64, and (2) a claim for declaratory judgment consistent with the finding that this cancellation was arbitrary, and that Gemini is entitled to renewal of the Velaris's certificate, id. ¶¶ 65-67.

This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.  It considers whether the Coast Guard action was arbitrary or capricious, or otherwise contrary to law, pursuant to 5 U.S.C. § 706(2)(A).[7]  "Declaratory relief is not an independent cause of action, and does not provide an independent source of federal jurisdiction," so Gemini's two counts are analyzed together.  Yancey v. District of Columbia, 991 F. Supp. 2d 171, 180 n.6 (D.D.C. 2013) (citing Ali v. Rumsfeld, 649 F.3d 762, 778 (D.C. Cir. 2011)); see Finamore v. Piader, 618 F. Supp. 3d 23, 29 (D. Mass. 2022)

---

[7] Gemini's complaint references other subsections of 5 U.S.C. § 706(2), see Compl. ¶¶ 55-63, but Gemini has only argued the "arbitrary or capricious" provision.

(Hillman, J.) ("A request for declaratory relief is not an independent cause of action.").

The "focal point" for this Court's review is "the administrative record already in existence, not some new record made initially in the reviewing court." Seafreeze Shoreside, Inc. v. United States Dept. of the Int., 123 F.4th 1, 27 (1st Cir. 2024) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)). "To review more than the information before the [agency] at the time [it] made [its] decision risks our requiring administrators to be prescient or allowing them to take advantage of post hoc rationalizations." Walter O. Boswell Memorial Hosp. v. Heckler, 749 F.2d 788, 792 (D.C. Cir. 1984). Nonetheless, "[the Court] may consider supplemental evidence to facilitate [its] comprehension of the record or the agency's decision." City of Taunton, Mass. v. United States E.P.A., 895 F.3d 120, 127 (1st Cir. 2018) (citing Town of Winthrop v. Federal Aviation Admin., 535 F.3d 1, 14 (1st Cir. 2008)). For example, this Court may seek "evidentiary supplementation as an aid to understanding highly technical . . . matters." Valley Citizens for a Safe Environ. v. Aldridge, 886 F.2d 458, 460 (1st Cir. 1989).

When evaluating a claim that an agency's action was arbitrary or capricious under 5 U.S.C. § 706(2)(A), the Court must "leave agency action undisturbed unless 'the agency has relied on factors which Congress has not intended it to

[12]

consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" City of Taunton, 895 F.3d at 126 (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). "This deference goes to the entire agency action," including the initial decision and the agency's later review of it. Id. (quoting Upper Blackstone Water Pollution Abatement Dist. v. United States E.P.A., 690 F.3d 9, 21 (1st Cir. 2012)); 5 U.S.C. § 551(13). The Court may not "substitute its judgment for that of the agency," but rather "must ensure, among other things, that the agency has offered a 'satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" Ohio v. Environmental Prot. Agency, 603 U.S. 279, 292 (2024) (alteration in original) (first quoting Federal Commc'ns Comm'n v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009); and then quoting State Farm Mut. Auto. Ins. Co., 463 U.S. at 43).

Gemini argues that the Coast Guard's action in revoking the Velaris's certificate was arbitrary or capricious because: (1) the Coast Guard does not have authority to undertake a "new vessel determination" under 46 C.F.R. § 67.175, because that

regulation specifies that the vessel owner must request such a determination, and Gemini did not, Mem. Supp. Mot. Prelim. Injunctive Relief ("Pl.'s Mem.") 13-14, ECF No. 8; and, (2) the Velaris is not a "new vessel" under the definition of the term at 46 C.F.R. § 67.3, as the Coast Guard's prior decisions and communications with Norton indicate, id. at 14-18.  Gemini further argues that the Coast Guard's interpretations of its regulations are not due deference here, as a result of prior industry and agency practice and unfair surprise.  Id. at 16-18; Pl.'s Prelim. Trial Mem. ("Pl.'s Trial Mem.") 10-11, ECF No. 35.[8]

The Coast Guard argues in response that: (1) the Coast Guard has broad authority to administer its vessel documentation system, which includes the power to determine whether a vessel is new, and which 46 C.F.R. § 67.175 supplements rather than

---

[8] Gemini incorporates the arguments advanced in its motion for a preliminary injunction by reference in its Preliminary Trial Memorandum, Pl.'s Trial Mem. 2, and further emphasizes that: (1) the Coast Guard previously represented to Gemini that a vessel of the Gemini's construction would be considered rebuilt rather than new, and internally recognized that there was no established minimum amount of reused material required to avoid classification as a new vessel, id. at 2-3; (2) the Coast Guard in this litigation advances a novel, structure-based definition of "new vessel" that was not articulated to Gemini before or when the Coast Guard issued its decision, and that is inconsistent with the Coast Guard's previous guidance and with the text of the regulation, id. at 4-9; and (3) fishing industry practice has relied on the Coast Guard's practice of not defining "new vessel" in this way, or, in any case, not enforcing such a definition, and thus the "unfair surprise" exception applies to preclude this Court from giving deference to the Coast Guard's interpretation on this issue, id. at 10-11.

restricts, Defs.' Opp'n Pl.'s Mot. Prelim. Inj. ("Defs.' Opp'n") 12-14, ECF No. 16; and, (2) the determination that the <u>Velaris</u> is a new vessel based on the Coast Guard's interpretation of its regulations was not arbitrary or capricious, given the text of the regulations, the historic understanding on which those regulations are based, and the informal nature of the agency practice on which Gemini allegedly relied, <u>id.</u> at 14-15.

This Court agrees with the Coast Guard on both issues, and thus rules that the agency's action here was not arbitrary or capricious.

### A.    The Coast Guard Had Authority to Determine that the <u>Velaris</u> Is a New Vessel

Gemini argues that the NVDC did not have authority to make a "new vessel determination" sua sponte, because one of the regulations referenced by the Coast Guard in its letter revoking the <u>Velaris</u>'s certificate provides for such a determination only when a vessel owner wants it, and Gemini never requested such a determination.  Pl.'s Mem. 13-14; 46 C.F.R. § 67.175(b).  The Coast Guard argues that this understanding of 46 C.F.R. § 67.175 turns the purpose of the regulation on its head, because the Coast Guard has broad statutory authority to issue and revoke certificates and to require vessel owners to submit reports in connection with them, and the regulation at issue merely

provides an avenue for owners to seek out a determination if they so wish.  Defs.' Opp'n 12-14.

This Court agrees with the Coast Guard.  Given its broad statutory authority over vessel documentation, the Coast Guard was well within that authority when it raised concerns about discrepancies in the Velaris's paperwork, requested reports to clarify the information submitted, and revoked the Velaris's certificate when it determined, contrary to Gemini's representations, that the Velaris was a new vessel.

To the extent that Gemini's argument is based on an interpretation of the Coast Guard's organic statutes, this Court must exercise its own independent judgment in interpreting the statutory scheme using "the traditional tools of statutory construction."  Loper Bright Enters. v. Raimondo, 603 U.S. 369, 394, 403 (2024).  To the extent that Gemini's argument is based on the Coast Guard's enacting regulations, however, this Court must defer to the agency's reasonable interpretations of its own regulations, provided that the regulations are "genuinely ambiguous," and that the Court is satisfied by its "independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight."  Kisor v. Wilkie, 588 U.S. 558, 573-76 (2019).  If the agency's interpretation is not entitled to such weight, it may nonetheless receive a lower form of deference based on its

"power to persuade."  Id. at 573 (quoting Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 159 (2012)).

The core of the disputed actions here is clear: Gemini applied to the Coast Guard's NVDC to renew the Michigan's Certificate of Documentation in July 2021, certifying that the information regarding the vessel remained "absolutely the same," AR 204-17, and submitted an incomplete application for a Certificate of Documentation for the Velaris as a vessel built in 2021 in May 2021, id. at 158.  The Michigan was scrapped at some point in 2021.  Id. at 454; Kulpinski Letter to Atl. Coast Dismantling.  In July 2022, Gemini again applied for renewal of the Michigan's certificate, and again certified that its specifications remained "absolutely the same."  Id. at 307.  In June 2023, Gemini applied to exchange the Michigan's certificate for one in the name of the Velaris, certifying in its application that the vessel in question had not been rebuilt or substantially altered, id. at 356-57, and, after that certificate was issued, applied for a replacement certificate in February 2024, again certifying that the vessel had not been rebuilt or substantially altered, id. at 406-08.

A routine third-party safety examination of the Velaris in February 2024 led the Coast Guard to question the accuracy of Gemini's representations, id. at 490-506, and thus, after some internal discussion of which regulatory standard applied, id. at

[17]

9-10, 490-92, 656-68, on April 1, 2024 the NVDC informed Gemini of its inquiry into "whether the Vessel is actually a new vessel as defined in 46 C.F.R. § 67.3," and requested records "by authority of 46 U.S.C. § 12139(a)" to conduct a "new vessel analysis and determination in accordance with the standard of 46 C.F.R. § 67.175(b)," giving Gemini thirty days to respond, id. at 11-12.  On May 10, 2024, Gemini responded with a letter from counsel and a submission of some of the requested materials. Id. at 21-56.  On June 7, 2024, the NVDC issued a second demand letter to Gemini, again citing 46 U.S.C. § 12139(a), requesting more information about the Velaris "in order that a new vessel analysis and determination with the standard of 46 C.F.R. § 67.175(b) may be completed," again with a thirty-day deadline. AR 16-17.  Gemini did not respond to this request, and the NVDC cancelled the Velaris's certificate by letter on July 8, 2024, citing its "determination," made "pursuant to 46 C.F.R. § 67.175," that the Velaris was a "new vessel" under both of 46 C.F.R. § 67.3's definitions of the term.  AR 2-3.

In the course of determining that the Velaris was a new vessel, the Coast Guard explicitly relied on one statutory provision and two regulations: 46 U.S.C. § 12139(a), which gives the Secretary of the Coast Guard broad authority to request reports pertaining to vessels' compliance with laws governing vessel qualifications for fishing and trade; 46 C.F.R. § 67.3,

which defines a "new vessel" as one the "hull and superstructure" of which are "constructed entirely of new materials," or one "constructed using structural parts of an existing vessel" that "have been torn down so that they are no longer advanced to a degree which would commit them to use in the building of a vessel"; and 46 C.F.R. § 67.175, which provides that the owner of a vessel constructed entirely of new materials need not apply for a new vessel determination -- although the owner must apply for initial documentation in the ordinary course -- but that, should the owner of a vessel made using parts of an existing vessel "want[] a determination that the resulting vessel is new," the owner must submit three categories of documents to the NVDC for review.

The parties paint dramatically different pictures of how this statutory and regulatory scheme applies to the facts at issue here. Gemini starts from 46 C.F.R. § 67.175, and argues that because, as that regulation states, "[w]hen a vessel has been constructed entirely of new materials, no application for a new vessel determination need be made under this section," 46 C.F.R. § 67.175(a), and "[w]hen parts of an existing vessel have been used in the construction of a new vessel," a determination will be made when "the owner wants a determination that the resulting vessel is new," id. § 175(b) (emphasis added), the Coast Guard was wrong to rely in any way on 46 C.F.R. § 67.175,

[19]

and in fact has no authority to initiate new vessel
determinations on its own, Pl.'s Mem. 12-14.

In the Coast Guard's telling, 46 C.F.R. § 67.175 is only
one small part of a larger scheme that gives it broad authority
to oversee vessel documentation -- given that, as the statute
the agency cited in its two demand letters to Gemini, 46 U.S.C.
§ 12139(a), provides, "[t]o ensure compliance with this chapter
and laws governing the qualifications of vessels to engage in
the coastwise trade and the fisheries, the [Coast Guard's]
Secretary may require owners . . . of documented vessels to
submit reports in any reasonable form and manner the Secretary
may prescribe," and given certain other provisions confirming
the Coast Guard's broad authority in this area, such as 46
U.S.C. § 12151's provision for penalties for violations of the
relevant chapter, including seizure of a vessel if application
information is knowingly falsified, and 14 U.S.C. § 504(c)(5)'s
reference to the Commandant of the Coast Guard's general power
of "suspension and revocation of licenses and certificates."
Defs.' Opp'n 13.  In the Coast Guard's view, the statutory
scheme establishes a kind of honor system backstopped by the
Coast Guard's power to monitor for compliance and to suspend and
revoke certificates, in line with Chapter 121 of Title 46 of the
United States Code's broad grant of authority to the Coast Guard
over "Documentation of Vessels."  Id. at 12.

This Court is persuaded that the Coast Guard's construction of the statutory and regulatory scheme is correct. Gemini starts from the wrong end of the telescope, focusing on one of the two specific regulations cited by the Coast Guard in its correspondence with Gemini, and arguing that that regulation, 46 C.F.R. § 67.175, does not apply because, in isolation, it does not appear to authorize sua sponte new vessel determinations. Yet, as the Coast Guard's communications with Gemini consistently (if sometimes imprecisely) indicated, the Coast Guard need not proceed under 46 C.F.R. § 67.175 to determine whether a vessel is new, when exercising its broad authority to grant and revoke certificates. Rather, as a neighboring regulation clarifies, the NVDC Director has authority to cancel certificates "upon a determination . . . that the issuance of the Certificate was improper for <u>any</u> reason." 46 C.F.R. § 67.173 (emphasis added).[9] The Coast Guard's broad statutory

_____

[9] Admittedly, a citation to 46 C.F.R. § 67.173's "improper" certification provision in the Coast Guard's letters to Gemini might have clarified what the Coast Guard was doing here. At the same time, those letters were focused on the specific <u>reason</u> the issuance of the <u>Velaris</u>'s certificate might have been improper -- that is, far from having undergone no rebuild or substantial alteration as Gemini repeatedly certified, the <u>Velaris</u> appeared to be, in effect, a new vessel. Director Washburn's references to 46 C.F.R. § 67.175 were, on balance, clear about the secondary role that § 67.175 played in the agency's decision-making process: the April 1, 2024 letter spoke of determining "whether the Vessel is actually a new vessel as defined in 46 C.F.R. § 67.3," and of conducting a "new vessel analysis and determination <u>in accordance with the standard of</u> 46

authority to request reports in connection with vessel
qualifications, 46 U.S.C. § 12139(a), which it cited in both of
its demand letters to Gemini, is, as the Coast Guard argues, one
piece of a broader scheme that gives the Coast Guard the
authority necessary to administer its vessel documentation
program, 46 U.S.C. Chapter 121, including the power to revoke
certificates, 14 U.S.C. § 504(c)(5), and even to seize vessels
when documentation information is knowingly falsified, 46 U.S.C.
§ 12151.  This whole scheme would seem little more than a waste
of time and paper were the Coast Guard to have no power ever to
check applicants' work.

---

C.F.R. § 67.175(b)," AR 11-12 (emphasis added), as did the June
7 demand letter, id. at 16-17.  This comports with the Coast
Guard's representation at trial that 46 C.F.R. § 67.175 provided
the agency with a reasonable framework for its requested
reports, and clarifies the agency's somewhat less precise
reference, in its letter cancelling the Velaris's certificate,
to its "determination," made "pursuant to 46 C.F.R. § 67.175,"
that the Velaris was a new vessel according to 46 C.F.R. §
67.3's definitions of the term.  AR 2-3.  It also clarifies the
agency's decision to cite just one subsection of the regulation,
46 C.F.R. § 67.175(b), in its first two letters to Gemini: §
67.175(b) lists three categories of documents that must be
submitted for the NVDC to conduct a new vessel determination,
providing the Coast Guard with a ready-made framework for
requesting documents.  Thus, the agency is not limited here to §
67.175(b)'s "parts of an existing vessel" definition as Gemini
argues it is, Pl.'s Trial Mem. 6, particularly given that both
the Coast Guard's initial demand letter and its notice of
determination referenced 46 C.F.R. § 67.3, which contains both
definitions of "new vessel," AR 2-3, 11-12.

This Court's view of the statutory scheme at issue is confirmed by the statutes' legislative history.  The Coast Guard argues that between 2010 and 2018 Congress responded to a series of tragic accidents in the fishing industry by passing a number of statutes meant to increase fishing vessel safety, including the statutes at issue here.  Def.'s Opp'n 7; see generally H.R. Rep. No. 111-303, pt.1, at 40-57, 93-94 (2009).  In the committee report on the proposed Coast Guard Authorization Act of 2010, which introduced the Coast Guard-administered certification and classification programs for new fishing vessels at issue here, the House Transportation and Infrastructure Committee stated that these provisions were "intended to strengthen the Coast Guard's implementation of its marine safety functions," based on a recognition that "[c]ommercial fishing is the most hazardous occupation in the United States," and that "[o]ne of the reasons for [the industry's] high casualty rate is because fishing vessels, unlike other commercial vessels, are not required to be built to standards specified by the Coast Guard."  H.R. Rep. No. 111-303, pt.1, at 93-94 (2009).  The Committee further explained that "'[c]lassification' provides evidence that a vessel is mechanically and structurally fit for the intended service," and grouped the related load line certification requirement under the same safety justification.  Id. at 117.  In view of the

[23]

grave safety concerns that informed the drafting of these provisions, it seems still more implausible that the Coast Guard should be required to turn a blind eye to even the most obvious application discrepancies.

In sum, because the Coast Guard has clear authority to administer its vessel documentation system, to request reports in connection with that system, and to revoke vessel certificates when they are improperly issued, its determination that the Velaris was a new vessel, and thus that its certificate ought be revoked, was not arbitrary just because Gemini did not expect the Coast Guard to check its work. As Gemini argued at trial, Director Washburn was free to use 46 C.F.R. § 67.175 as a reference point for what kinds of documents to request from Gemini in her demand letters, while making her determination that the Velaris was a new vessel; moreover, the Director explained what she was doing with reference to the Coast Guard's questioning whether the Velaris was a new vessel and cited the statute that gives the Coast Guard authority to ensure compliance with vessel qualifications, drawing a clear rational connection between the facts to be found and the action contemplated. AR 2-3, 11-12. The Director's citation to 46 C.F.R. § 67.175, despite that regulation's not appearing to encompass sua sponte new vessel determinations, therefore does

not render the agency's actions, when harmonized with other regulations, arbitrary or capricious.

### B.    The Coast Guard's Interpretation of "New Vessel" Is Persuasive

The remainder of this case poses the equivalent of a famous paradox: how much of a vessel's structure must be retained to maintain the ship's identity over time?[10]  That is, framed in the terms of the law and the applicable regulations: was the NVDC's determination that the Velaris was in fact a new vessel, based on its interpretation of the regulatory definitions at 46 C.F.R. § 67.3, reasonable, if the Court must defer to the agency's interpretation of its own regulations, or, if it need not, sufficiently persuasive?

Gemini's answer is that, under the applicable regulations, a twenty-by-one-foot section of either the Michigan's keel or bulwark, welded above the keel of the Velaris -- apparently in

---

[10] "The Ship of Theseus, also known as Theseus' paradox, is a thought experiment that raises the question of whether an object that has had all of its components replaced remains fundamentally the same object." Clear Spring Prop. and Cas. Co. v. Wello and Mom, LLC., No. 21-CV-24234, 2024 WL 5103640, at *5 (S.D. Fla. Oct. 1, 2024), report and recommendation adopted sub nom. Clear Spring Prop. and Cas. Co. v. Wello and Mom, LLC, No. 21-CV-24234, 2025 WL 626028 (S.D. Fla. Feb. 26, 2025); see ship of Theseus, Encyc. Britannica (Feb. 3, 2025), https://www.britannica.com/topic/ship-of-Theseus-philosophy.  As the classical version of the problem shows -- where each plank of the ship is removed one-by one, and immediately replaced -- we are here a long way here from Theseus's ship.  See id.

several cut-up parts -- ought be enough to maintain the
Michigan's identity under its new name Velaris.[11]  Pl.'s Mem. 14-
18; AR 454-60.  In support of its view, Gemini argues that "new
vessel" is a high standard to meet, and that the Velaris does
not fit either regulatory definition of the term because the
section of the Michigan incorporated into the Velaris means that
it is not built "entirely of new material," and that this
section was not "torn down" so as to be "no longer advanced to a
degree that would commit them to use in the building of a
vessel," as it is a structural part of the Michigan committed to
use in the Velaris's structure -- an emphasis that is, in its
view, consistent with historic understandings of the term.
Pl.'s Mem. 14-15; 46 C.F.R. § 67.3.  Gemini further argues that
the Coast Guard's interpretation of these definitions is not due
any special deference, because the Coast Guard's alleged
practice of finding that vessels constructed upon other vessels'
keel sections are not new, as shown by its communications with
Norton regarding this and a purportedly similar project,
triggers the exception to deference for interpretations that

---

[11] Collyer testified that the section of the Michigan that
was incorporated into the Velaris served as, or as something
like, the Velaris's "keelson."  See keelson, Oxford English
Dictionary, http://www.oed.com (2025) (defining "keelson" as
"[a] line of timber placed inside a ship along the floor-timbers
and parallel with the keel, to which it is bolted, so as to
fasten the floor-timbers and the keel together; a similar bar or
combination of iron plates in iron vessels").

[26]

reverse course without explanation and cause unfair surprise. Pl.'s Mem. 16-18; Pl.'s Trial Mem. 10-11.

The Coast Guard interprets its regulations otherwise, and argues that the regulations' text and the historic understanding that informs them support its view that the pieces of the Michigan incorporated into the Velaris are not part of its hull or superstructure, and thus the Velaris is constructed of entirely new material in the relevant sense, and that those pieces could not be committed to use in building a vessel, as their essentially extraneous placement in the Velaris's structure shows; that the Coast Guard's interpretation is also supported by the statutory definition at 46 U.S.C. § 4503 of a vessel as "built" based on the date its keel was laid; and that informal advice alone is insufficient to trigger the exception to deference. Defs.' Opp'n 14-15; Defs.' Br. 17-21.

As noted supra section III.A, an agency's reasonable interpretation of its own regulations is due deference whenever the regulations are "genuinely ambiguous," if the Court is satisfied by its "independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight," based on several factors. Kisor, 588 U.S. at 573-79. This is often referred to as "Auer deference." Id. at 563 (citing Auer v. Robbins, 519 U.S. 452 (1997)). Genuine ambiguity arises only when, "after a court has resorted to all

the standard tools of interpretation," that is, after carefully considering "the text, structure, history, and purpose of the regulation," ambiguity remains, such that there is more than "one reasonable construction." Id. at 573-75. The agency's interpretation must also be reasonable, and, in an inquiry that does not "reduce to any exhaustive test," the Court must also determine that the interpretation is "actually made by the agency," that is, that it represents "the agency's 'authoritative' or 'official position,' rather than any mere ad hoc statement"; that the interpretation "in some way implicate[s the agency's] substantive expertise"; and that it "reflect[s] 'fair and considered judgment,'" as opposed to a "convenient litigating position" or "post hoc rationalization[n]." Id. at 577-79 (first quoting United States v. Mead Corp., 533 U.S. 218, 257-59, 258 n.6 (2001) (Scalia, J., dissenting); and then quoting Christopher, 567 U.S. at 155).

As Gemini properly argues, there is an exception to Auer deference for new interpretations that create "unfair surprise," such as when the agency's interpretation of a regulation "substitutes one view of a rule for another," or "impose[s] retroactive liability on parties for longstanding conduct that the agency had never before addressed." Id. at 579 (quoting Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 170 (2007)). The imposition of "significant monetary liability" for

conduct that "took place a time when that party lacked fair notice of the interpretation at issue" is also disfavored.  Sun Cap. Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund, 724 F.3d 129, 140 (1st Cir. 2013).  The Supreme Court has declined to apply Auer deference to an agency's interpretation of its ambiguous regulations where, for example, the interpretation would have "impose[d] potentially massive liability . . . for conduct that occurred well before [the] interpretation was announced," such that deference "would seriously undermine the principle that agencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'"  Christopher, 567 U.S. at 155-56 (quoting Gates & Fox Co. v. Occupational Safety & Health Rev. Comm'n, 790 F.2d 154, 156 (D.C. Cir. 1986)).

A determination that Auer deference does not apply to an agency's interpretation does not mean that its interpretation is given no weight at all.  See Sun Cap. Partners, 724 F.3d at 141; Christopher, 567 U.S. at 159.  Rather, "when the reasons for [such deference] do not apply, or countervailing reasons outweigh them, courts should not give deference to an agency's reading, except to the extent that it has the 'power to persuade.'"  Kisor, 588 U.S. at 573 (quoting Christopher, 567 U.S. at 159).  This "power to persuade" standard is known as "Skidmore deference," which "entails . . . a sliding-scale

[29]

approach under which the degree of deference accorded to an
agency interpretation hinges on a variety of factors, such as
'the thoroughness evident in [the agency's] consideration, the
validity of its reasoning, [and the] consistency [of its
interpretation] with earlier and later pronouncements," in
addition to other factors such as the agency's expertise.  Doe
v. Leavitt, 552 F.3d 75, 80-81 (1st Cir. 2009) (quoting Skidmore
v. Swift & Co., 323 U.S. 134, 140 (1944)).  "These factors are
meant to test the seriousness of, and therefore the respect due
to, the process that underlies the agency's interpretation."
Id. at 81.  "The most salient of [these] factors is the validity
of [the agency's] reasoning."  Fawcett v. Citizens Bank, N.A.,
919 F.3d 133, 138 (1st Cir. 2019).  As Judge Selya noted,
writing for the First Circuit, to avoid being an "unabashed
tautology," Skidmore deference "must mean something more than
that deference is due only when an inquiring court is itself
persuaded that the agency got it right.  Otherwise, Skidmore
deference would not be deference at all."  Leavitt, 552 F.3d at
81.  Even so, as is relevant here, "the level of deference owing
to informal agency interpretations is freighted with
uncertainty."  Id. at 79.

This Court deems it unnecessary to decide whether Auer
deference applies to the interpretation by which the NVDC
determined that the Velaris was a new vessel, because it would

uphold that interpretation based on the lower <u>Skidmore</u> standard anyway.[12]  <u>See</u> <u>Doe</u> v. <u>Cape Elizabeth Sch. Dist.</u>, 832 F.3d 69, 77 n.7 (1st Cir. 2016) ("Here, we find the agency interpretations in the regulations and letters persuasive, even under the lesser <u>Skidmore</u> deference, and hence do not address the particular level of deference afforded to these materials."); <u>Federal Express Corp.</u> v. <u>Holowecki</u>, 552 U.S. 389, 399 (2008) (similar). This Court finds the Coast Guard's interpretation of the regulations defining "new vessel" persuasive, and is not persuaded that any special fair notice concerns precluded its application, and therefore rules that the Coast Guard's application of that interpretation to the Velaris was not arbitrary or capricious.

       **1.    The Coast Guard's Interpretation of "New Vessel"**

---

[12] Different courts have come to different conclusions regarding whether to apply deference to decisions similar to this one.  <u>See</u> <u>American Hawaii Cruises</u> v. <u>Skinner</u>, 713 F. Supp. 452, 466-67 (D.D.C. 1989) (declining to defer to Coast Guard's structure-based interpretation of vessel rebuild statute where interpretation was not longstanding or consistent); <u>Keystone Shipping Co.</u> v. <u>United States</u>, 801 F. Supp. 771, 781-83 (D.D.C. 1992) (similar); <u>Philadelphia Metal Trades Council, MTD, AFL-CIO</u> v. <u>Allen</u>, No. 07-145, 2008 WL 4003380, at *10-18 (E.D. Pa. Aug. 25, 2008) (deferring to Coast Guard interpretation of regulation where interpretation was longstanding and consistent); <u>Diamond Servs. Corp.</u> v. <u>Curtin Maritime Corp.</u>, 99 F. 4th 722, 731-35 (5th Cir. 2024) (deferring to NVDC interpretation of foreign rebuild status regulations where interpretation was reasonable and not inconsistent).

As set out <u>supra</u> section III.A, Director Washburn referenced both the definitions of "new vessel" at 46 C.F.R. § 67.3 and the standard at 46 C.F.R. § 67.175 in her letter determining that the Velaris is a new vessel and revoking the Velaris's certificate.  AR 2-3.  Captain Beach's affirmance of the Director's decision stated that the NVDC "correctly determined that the VELARIS is a new vessel," without citing the regulations.  AR 1.

The definitions of "new vessel" at 46 C.F.R. § 67.3 are as follows:

> New vessel means a vessel:
> (1)  The hull and superstructure of which are constructed entirely of new materials; or
> (2)  Which is constructed using structural parts of an existing vessel, which parts have been torn down so that they are no longer advanced to a degree which would commit them to use in the building of a vessel.

46 C.F.R. § 67.3.  These definitions are also referenced at 46 C.F.R. § 67.175, which states that vessels "constructed entirely of new materials" need not apply for a new vessel determination, 46 C.F.R. § 67.175(a), but "[w]hen parts of an existing vessel have been used in the construction of a vessel," the vessel's owner may request a new vessel determination upon the submission of specified materials to the NVDC's Director, id. § 67.175(b).

Applying these definitions, Director Washburn explained first that "apart from" the single section "cropped from the . .

[32]

. <u>Michigan</u> and inserted into the enclosed skeg of the VELARIS," the <u>Velaris</u>'s hull and superstructure "were constructed entirely of new material." AR 2. She also stated, with reference to the second regulatory definition, that this section was "not sufficient to relieve the [<u>Velaris</u>] of its status as a new vessel," and that Gemini had provided insufficient information concerning the state of the <u>Michigan</u> and the extent to which parts of the <u>Michigan</u> were used in the <u>Velaris</u>'s construction. AR 3. In her letter affirming Director Washburn's decision, Captain Beach also referred to the "review by the Office of Design and Engineering Standards," AR 1, which advised the NVDC shortly after the certificate's revocation that the "torn down" parts of the <u>Michigan</u> were "extraneous to the keel structure" of the <u>Velaris</u> and thus did not amount to "<u>structural</u> parts that are <u>structurally used</u> in the rebuilt vessel's hull or superstructure," which it viewed as key to determining whether the definitions applied, AR 462-63. Captain Beach also referenced the advice of the Coast Guard's Marine Safety Center, which, upon request from the Coast Guard Sector Southeastern New England before the NVDC sent its initial demand letter, AR 490, advised the NVDC that the section of the <u>Michigan</u> that was inserted into the <u>Velaris</u> appeared not to be "sufficiently advanced enough to commit its use in the building of the VELARIS," referring to the second regulatory definition, AR 10.

    2.   **Skidmore Analysis**

First, applying the Skidmore factors set out above, this
Court accords considerable weight to the Coast Guard's expertise
on the question of what constitutes a new vessel.  The
interpretations at issue were made by the Director of the NVDC
and confirmed by the Coast Guard's Director of Inspections and
Compliance.  AR 1-12.  "The Coast Guard acted through the NVDC,
its arm tasked with making vessel documentation rulings, and the
ruling came from the Director, not a lower-level staffer."
Diamond Servs. Corp. v. Curtin Maritime Corp., 99 F. 4th 722,
735 (5th Cir. 2024).  The decision was subsequently placed on
the NVDC's publicly available website, suggesting that the Coast
Guard's NVDC invoked its expertise to make an official,
authoritative ruling.  See id.; Gemini Fishing, Inc. 07-08-2024,
National Vessel Documentation Center (July 8, 2024),
https://www.dco.uscg.mil/Portals/9/DCO%20Documents/NVDC/U.S.%20B
uild%20Determination%20-%20Gemini%20Fishing%20Inc%2007-08-
2024.pdf?ver=y2k3mhC4r40q-MFa2uvO_g%3d%3d.  If anyone may be
said to have expertise in resolving the Theseus's ship paradox,
in other words, it would appear to be the Coast Guard's NVDC.

Second, the process undertaken by the Coast Guard here
reflects considerable thoroughness.  Before sending its initial
demand letter on April 1, 2024, the NVDC received a memorandum
from the Coast Guard's Marine Safety Center, which reviewed the

[34]

available materials, determined that the Velaris appeared to be
a new vessel under the second definition of the term at 46
C.F.R. § 67.3, and requested that the NVDC conduct a new vessel
determination.  AR 9-10.  The NVDC then sent an initial demand
letter for information about the Velaris's construction to
Gemini, and, after determining that the materials submitted by
Gemini were incomplete, sent a second demand letter requesting
more information.  Id. at 11-17.  Only after the thirty-day
response period provided for in the second demand letter expired
did the NVDC issue its letter determining that the Velaris was a
new vessel and cancelling its certificate.  Id. at 4-5.
Furthermore, although the Coast Guard's Naval Architecture
Division did not respond to the NVDC's request for technical
assistance until July 12, 2024, id. at 461, four days after the
determination letter was sent, id. at 2-3, Captain Beach cited
its memorandum and the Marine Safety Center's advice in her
decision upholding the NVDC's determination on appeal, id. at
1.[13]  The Naval Architecture Division also concluded that the
Velaris was a new vessel because the "torn down" parts of the

---

[13] As noted supra section III, the deference appropriate to
arbitrary or capricious review "goes to the entire agency
action."  City of Taunton, 895 F.3d at 126 (quoting Upper
Blackstone Water Pollution Abatement Dist., 690 F.3d at 20).
Here, the final agency action includes Captain Beach's review of
Gemini's appeal, per the regulation she cited in her letter, AR
1; 33 C.F.R. 1.03-15.

Michigan were "extraneous to the keel structure" of the Velaris.
Id. at 462-63.  In sum, the Coast Guard sought as much
information as possible to complete its review, including
internal advice from its own expert bodies, and only ended this
review process when Gemini stopped providing it with
information.

As to the "most salient" Skidmore factor -- the validity of
the agency's reasoning -- this Court is persuaded that the Coast
Guard's reasoning is valid.  Fawcett, 919 F.3d at 138.  The NVDC
determined that the Velaris is a new vessel both because the
Velaris's "hull and superstructure . . . [are] constructed
entirely of new material," and because, on the record before it,
the material from the Michigan that was incorporated into the
Velaris amounted to no more than "parts . . . torn down" to a
degree that would not "commit them to use in the building of a
vessel."  AR 4-5.  The NVDC did not explain to Gemini exactly
how it interpreted the key terms "hull" and "superstructure," or
"torn down" and "commit[ted] to use in the building of a
vessel," but, as the Coast Guard has pointed out, 46 C.F.R. §
67.3 defines "hull" as the "shell, or outer casing, and internal
structure below the main deck which provide both the flotation
envelope and structural integrity of the vessel," and
"superstructure" as the "main deck and any other structural part

above the main deck." Def.'s Br. 19-20.[14]  The parties agree,
moreover, on where to look for clarification in interpreting
these definitions: the century-old Supreme Court case called The
Jack-O-Lantern, Def.'s Br. 18-19; Pl.'s Mem. 14, which the Coast
Guard describes as providing the "historical origins" of the
contested regulations, Defs.' Opp'n 9[15]:

> [W]here the keel, stem, and stern posts and ribs of an
> old vessel, without being broken up and forming an
> intact frame, are built upon as a skeleton, the case
> is one of an old vessel rebuilt, and not of a new
> vessel.  Indeed, without regard to the particular
> parts reused, if any considerable part of the hull and
> skeleton of an old vessel in its intact condition,
> without being broken up, is built upon, the law holds
> that in such a case it is the old vessel rebuilt, and
> not a new vessel.  But where no piece of the timber of
> an old vessel is used without being first dislocated
> and then replaced, where no set of timbers are left
> together intact in their original positions, but all
> the timbers are severally taken out, refitted, and
> then reset, there we have a very different case.  That
> is a case of a vessel rebuilt.

---

[14] These definitions were specifically added to close a
perceived loophole in the regulations, in response to a decision
in which a court did not defer to the Coast Guard's
interpretation of its foreign rebuild regulations and the
statute on which they were based.  Han Deng, Comment, "Built" or
"Rebuilt"? That Is the Question: Risk of Losing the Coastwise
Privilege After Vessel Modification Projects Outside the United
States, 35 Tul. Mar. L.J. 241, 249-50 (2010); American Haw.
Cruises, 713 F. Supp. at 466-69.

[15] Another court has described the related regulatory
definition of a rebuilt foreign vessel, whereby a vessel is
rebuilt when "any considerable part of the hull in its intact
condition without having been broken up is built upon or
substantially altered," 46 C.F.R. § 67.177, as "drawn from the .
. . Grace Meade decision," which the Supreme Court quotes in The
Jack-O-Lantern.  American Haw. Cruises, 713 F. Supp. at 463.

New Bedford Dry Dock Co. v. Purdy (The Jack-O-Lantern), 258 U.S.
96, 100 (1922) (emphasis added) (quoting United States v. The
Grace Meade, 25 F. Cas. 1387, 1389 (E.D. Va. 1876) (No.
15,243)).  The Supreme Court, while declining to "announce rigid
definitions of repairs and new construction," described this
definition as "sound and helpful" more than a century ago.  Id.

The text of the regulatory definitions, in conjunction with
this historic understanding, supports the Coast Guard's
reasoning here.  Gemini's argument that the section of the
Michigan that was inserted into the Velaris is part of the
Velaris's hull because it serves as the Velaris's keel, Pl.'s
Mem. 15, is significantly undercut by the photographs in the
record, AR 455-60, and by the Naval Architecture Division's
determination that the section of the Michigan in the Velaris is
"extraneous to the [Velaris's] keel structure" and not
"structurally used in the rebuilt vessel's hull or
superstructure," AR 462-63.  The section of the Michigan that
was incorporated into the Velaris appears not only not to be the
Velaris's keel; it also does not "provide [the Velaris's]
structural integrity." 46 C.F.R. § 67.3.  Thus, the Coast
Guard's determination that the Velaris's hull and superstructure
were constructed entirely of new material was based on a valid
interpretation of its regulations.

Likewise, the second regulatory definition of "new vessel" aligns precisely with the Naval Architecture Division's interpretation of this regulation as applying to projects where sections of old vessels are not "structurally used in the rebuilt vessel's hull or superstructure," AR 462-63, and with the Marine Safety's Center's similar suggestion to the NVDC, prior to the NVDC's initial determination letter, that the section of the Michigan that was incorporated into the Velaris appeared to be "not sufficiently advanced enough to commit its use in the building of the VELARIS," AR 10.  The Jack-O-Lantern's definition of an "old vessel rebuilt" as one where a "considerable part of the hull and skeleton of an old vessel in its intact condition, without being broken up" is "built upon" supports the Coast Guard's view that, at minimum, the sections of the old vessel retained must contribute significantly to the rebuilt vessel's structural integrity in order to avoid the vessel's being deemed new, and further undercuts Gemini's argument that, despite the regulatory definitions of hull and superstructure and this century-old precedent, it was not on notice of how these regulations might be construed.  The Jack-O-Lantern, 258 U.S. at 100 (emphasis added) (quoting The Grace Meade, 25 F. Cas. at 1389).  Unlike the "decades-long practice" and "very lengthy period of conspicuous inaction" at issue in Christopher, 567 U.S. at 157-58, the Coast Guard here

[39]

interpreted regulations that were less than twenty years old, in a way that is consistent with century-old Supreme Court precedent, when it determined that the Velaris was a new vessel.

Despite this background, and although it is not framed in these terms, Gemini's strongest argument here goes to another Skidmore factor: the consistency of the agency's interpretations over time, and the related question of whether Gemini had fair notice of those interpretations. Pl.'s Mem. 10-11, 16-18; see Leavitt, 552 F.3d at 81. In brief: how was Gemini supposed to know, before it invested considerable sums of money in this rebuild project, that the Velaris would be deemed a new vessel, when the regulatory standards are arguably ambiguous, prior precedent did not clearly establish the agency's interpretation of the relevant regulations, and some advice from agency employees may have suggested to Gemini that the Velaris would not be deemed a new vessel?

To support the argument that Gemini did not receive fair notice of the interpretations at issue here, Gemini points to e-mails from Coast Guard Chief Andrea Heck with regard to a previous project, stating that a rebuild incorporating a small portion of an existing vessel would not be deemed new, and a follow-up e-mail and phone conversation purportedly confirming that this advice would apply to the Velaris, in addition to some internal Coast Guard communications that show that the agency

[40]

was aware of at least some similar rebuild projects.  Pl.'s Mem. 6; Pl.'s Trial Mem. 10-11; see AR 25, 494-95, 664.  Gemini has not, however, in fact pointed to any prior inconsistent, authoritative interpretations from the Coast Guard, but only to informal phone and e-mail advice, given primarily with regard to a different project, and all on the basis of Norton's own (perhaps selective) representations, which advice was also accompanied by written disclaimers.  AR 25-26, 494-95, 663-65.  At trial, moreover, Gemini failed to establish that the rebuild practices at issue here were any more widespread than the e-mails on the record suggest, and these e-mails show only that the Coast Guard had seen a build like this before, which was also designed by Norton, and was concerned about it.  AR 491.

Confronting a new problem is not the same thing as acting inconsistently.  See Leavitt, 552 F.3d at 82 ("As to consistency, there is no evidence that the [agency] has ever interpreted the [term] . . . in a manner inconsistent with the interpretation that [it] advances here."); Diamond Servs. Corp., 99 F. 4th at 734-35 (distinguishing cases declining to defer to the Coast Guard on the grounds that the plaintiff had "not established that the Coast Guard's ruling is inconsistent with prior agency decisions").  As the Coast Guard argues, moreover, informal advice does not bind the agency to act in conformity with it, and even a completed mistake will not bind the agency

[41]

to repeat it.  Defs.' Br. 27-28; see Southeast Shipyard Ass'n v. United States, 735 F. Supp. 10, 12 (D.D.C. 1990); Chem-Haulers, Inc. v. Interstate Com. Comm'n, 565 F.2d 728, 730 (D.C. Cir. 1977); see also Kristin E. Hickman & Matthew D. Kreuger, In Search of the Modern Skidmore Standard, 107 Colum. L. Rev. 1235, 1286 (2007) (observing that "'consistency' seems less dispositive than other Skidmore factors").

In essence, Gemini makes a reliance argument: the agency had never done this before, and may have suggested that it would not do this now.  Indeed, as the Supreme Court recalled in the landmark estoppel case Heckler v. Community Health Servs. of Crawford Cnty., Inc., 467 U.S. 51, 61 n.13 (1984), "the Government should turn square corners in dealing with the people."  Heckler, 467 U.S. at 61 n.13 (quoting St. Regis Paper Co. v. United States, 368 U.S. 208, 229 (1961) (Black, J., dissenting)).  At the same time, as Heckler also reiterated, estoppel as a rule does not lie against the government, and "[m]en must turn square corners when they deal with the Government."  Id. at 63 (quoting Rock Island, A. & L.R. Co. v. United States, 254 U.S. 141, 142 (1920)).  Gemini has not done so here.

Gemini depicts itself as having been led down the primrose path to ruin, encouraged to go ahead with an expensive project now frustrated due to an unprecedented application of a

[42]

regulation that was never before clearly defined.  The record,
however, suggests that it was at least as much Gemini that was
doing the leading: rather than seek in earnest to discern
whether the <u>Velaris</u> would be determined a new vessel -- or
consider the regulations at issue with reference to century-old
Supreme Court precedent -- Norton secured an informal statement
that prior informal guidance might apply at the eleventh hour,
in a series of e-mails that Gemini's counsel itself described at
trial as self-serving.  Rather than suggest that Gemini did not
have fair notice that the <u>Velaris</u> might be deemed a new vessel,
this instead suggests the opposite: that Gemini, or at least
Norton, knew or at least feared that the regulations would be
interpreted to mean what they say, and what the Supreme Court
long ago suggested they might mean.

Given that the Coast Guard's interpretation of "new vessel"
was based on its expertise, thorough, validly reasoned, and not
inconsistent with prior rulings, this Court finds it persuasive
here, and rules that the Coast Guard's application of this
interpretation to the <u>Velaris</u> was not arbitrary or capricious.

## IV.  CONCLUSION

Accordingly, this Court rules as matter of law, based upon its findings of fact, that the Coast Guard's action in determining that the Velaris is a new vessel and cancelling its Certificate of Documentation was not arbitrary or capricious.

**SO ORDERED.**

                              /s/ William G. Young
                              WILLIAM G. YOUNG
                                    JUDGE
                                   of the
                              UNITED STATES[16]

---

[16] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.

[44]